**Gerald F. BACON, Plaintiff,**

v.

**GREAT PLAINS MANUFACTURING, INC., Defendant.**

**No. 95–4137–SAC.**

United States District Court, D. Kansas.

Feb. 14, 1997.

Michael F. Broemmel, Broemmel Law Office, Topeka, KS, for Plaintiff.

John W. Mize, Clark, Mize & Linville, Chtd., Salina, KS, for Defendant.

CROW, Senior District Judge.

## MEMORANDUM AND ORDER

Gerald F. Bacon brings this action under the Americans with Disabilities Act (ADA) against his former employer, Great Plains Manufacturing, Inc. (GPM). Bacon contends that he suffers from depression and that his mental condition qualified as a disability within the meaning of the ADA. Bacon alleges that GPM discriminated against him in the terms and conditions of his employment and that he was ultimately terminated due to his disability. Bacon seeks damages for his loss of income and benefits, pain, suffering and emotional distress, punitive damages and attorney's fees.

GPM denies liability on several grounds. First and foremost, GPM contends that Bacon did not suffer from a "disability" impairing a major life activity during the time that he alleges it to have discriminated against him. Second, even if Bacon suffered from a disability within the meaning of the ADA, GPM contends that it was completely unaware of that disability and therefore could not have violated the ADA.[1] Third, assuming that Bacon has cleared the first two hurdles, due to his failure to perform tasks in a timely manner and his insubordination to his supervisor, Bacon was not qualified to do his job in the marketing department with or without reasonable accommodation. Finally, GPM contends that Bacon can produce no evidence casting any doubt upon the legitimate business reasons justifying its actions.

This case comes before the court upon GPM's motion for summary judgment (Dk.23). Bacon has responded and GPM has filed a reply. The court, having considered the briefs of the parties and the applicable law, grants GPM's motion for summary judgment.

## Summary Judgment Standards

A court grants a motion for summary judgment if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The substantive law governing the suit dictates which facts are material or not. *Id.* at 248, 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Ele. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.,* 849 F.2d 1269, 1273 (10th Cir.1988).

The movant's burden under Rule 56 of the Federal Rules of Civil Procedure is to lay out the basis of its motion and to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.) *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). "A movant is not required to provide evidence negating an opponent's claim." *Committee for First Amendment v. Campbell,* 962 F.2d 1517, 1521 (10th Cir.1992) (citation omitted).

If the moving party. meets its burden, then it becomes the nonmoving party's burden to show the existence of a genuine issue of material fact. *Bacchus Industries, Inc. v. Arvin Industries, Inc.,* 939 F.2d 887, 891 (10th Cir.1991); *see Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) ("If the moving party meets this burden, the non-moving party then has the burden to come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving

---

1. In light of the court's ruling on the issues of whether Bacon was disabled and whether GPM knew that he was disabled, it is unnecessary to

address the additional arguments advanced by GPM.

party's case."). When the nonmoving party will have the burden of proof at trial, "'Rule 56(e)' ... [then] requires the nonmoving party to go beyond the pleadings and by her own affidavits or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Mares v. ConAgra Poultry Co., Inc.,* 971 F.2d 492, 494 (10th Cir.1992) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun,* 956 F.2d 949, 951 (10th Cir.1992) (citations omitted); *see Martin,* 3 F.3d at 1414 (non-moving party cannot rest on the mere allegations in the pleadings). "Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Hedberg v. Indiana Bell Telephone Co., Inc.,* 47 F.3d 928, 929 (7th Cir. 1995); *see Vega v. Kodak Caribbean, Ltd.,* 3 F.3d 476, 479 (1st Cir.1993) ("Optimistic conjecture, unbridled speculation, or hopeful surmise will not suffice."). The court views the evidence of record and draws inferences from it in the light most favorable to the nonmoving party. *Burnette v. Dow Chemical Co.,* 849 F.2d at 1273.

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion is not the chance for a court to act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 346 (10th Cir.1986), *cert. de-*

*nied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

### Uncontroverted Facts

In light of the court's determination that there is insufficient evidence for a rational factfinder to conclude that Bacon was disabled, or in the alternative, assuming *arguendo,* that even if he was disabled, that the defendant was unaware of that disability, it is unnecessary for the court to delve into all of the facts set forth by the parties.[2] In short, the court has decocted the uncontroverted facts to only those necessary to explain its decision.

GPM is a manufacturing company that produces a line of farm implements and lawn care products at plants located in Kansas. Bacon, a forty-seven year old male, began working for GPM on July 2, 1990, in the marketing department. In 1993, Linda Hanson became the marketing manager at GPM and at that point assumed direct supervision over Bacon. When Bacon and Hanson had initially met in 1990 they had gotten off to a "rocky" start.

At GPM, Bacon's basic job duties were to do some photography and copy writing for the company newsletter. In January 1994, GPM gave Bacon an outline of his job responsibilities, which included writing the company newsletter, preparing maps, company bulletins, photography, copyrighting for various company documents, and some miscellaneous projects related to the company Christmas party. During his employment at GPM, Bacon had at times been the kind of employee who had difficulty meeting deadlines. Bacon needed coaxing and/or monitoring of his progress to complete tasks in a timely fashion.

In 1987, prior to working for GPM, Bacon's marital relationship began to deteriorate. In the early 1990's Bacon had problems emotionally and physically abusing his

---

**2.** In response to certain uncontroverted facts set forth in GPM's brief, Bacon responded by summarizing his position and then citing as support "Bacon Deposition, generally." This is improper. The court is not required to scour Bacon's entire deposition on the prospect that somewhere within those pages there may be something which supports the plaintiff's position. *See Thomas,* 968 F.2d at 1025 ("In the absence of

such specific reference [as required by Fed. R.Civ.P. 56(e)], we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury."). The court has ignored responses unsupported by direct citation to deposition testimony or other appropriate evidence and deemed those facts set forth by GPM as uncontroverted.

children. In March of 1992 Bacon contemplated suicide based in part upon his estrangement from his youngest son. Bacon voluntarily admitted himself to Prairie View Hospital in Newton, Kansas. Bacon was diagnosed with major depression. Upon his release from the hospital, Bacon lived apart from his family.

At the time of his hospitalization in 1992, Bacon believed that he was getting along well in his job at GPM. After his discharge from Prairie View Hospital, Bacon resumed his full duties at GPM.

On October 17, 1993, Bacon's wife served him with separation papers. On October 22, 1993, Bacon was participating in a photo shoot for GPM at Salina, Kansas. During the shoot, a GPM employee was annoying Bacon. Bacon walked off the job. Bacon called GPM and indicated that he was quitting and wanted his final paycheck. Bacon then drove to Salt Lake City, Utah, driving 70 to 75 miles per hour the entire way. Bacon arrived in Salt Lake City at 4:30 a.m. and at 1:30 p.m. left and returned to Salina. After he returned to Salina, Bacon apologized to Eric Lund, GPM's chief operating officer. Bacon admitted that he was wrong. GPM took Bacon back to work. Bacon worked continuously from October 25, 1993, through December 2, 1993.

On December 2, 1993, Bacon was again hospitalized at Prairie View for five or six days. Bacon again contemplated suicide because of his separation from his wife and the physical abuse he inflicted on his children. Bacon told the staff at Prairie View that he had not been productive for GPM for sixty days. While at Prairie View, several tests were performed on Bacon. Those tests showed no deficits in attention, concentration, or short-term memory. Those tests showed Bacon's acquired knowledge, long-term memory, verbal communication, concept formation, abstract thinking, attention to detail, cognitive flexibility and mental alertness were within the high average range.

After he was discharged from Prairie View on December 8, 1993, Bacon returned to work and resumed his job full-time at GPM. Bacon worked continuously from that date until September 1994. Other than attending

some group therapy workshops in December of 1993 and January of 1994 to control his anger, the only medical treatment that Bacon had in 1994 was a visit to a family physician because his neighbors were complaining that he snored too loudly.

In August of 1994, Linda Hanson was preparing to go on vacation. As part of her preparation, Hanson gave Bacon a list of projects which he needed to give immediate attention while she was gone. During a meeting to discuss the list, Bacon accused Hanson of dumping work off on him. Bacon later apologized.

Upon her return from vacation on September 12, 1994, Hanson met with Bacon to go over the project list she had given him before she left on vacation. Bacon had not completed the projects she had assigned to him. During that meeting, Bacon suggested to Hanson that unless he kept a daily log of his activities, there would be no way for Hanson to know what he was doing on a daily basis. Hanson responded favorably to that suggestion, and instructed Bacon to begin keeping a daily log. Bacon responded by saying "I refuse to do it. It would be a waste of time and I won't do it."

Bacon was again instructed by a memo from Hanson to keep a daily log. Bacon was angered by the memo. Bacon subsequently encountered Hanson and began yelling and shaking his head in a hostile manner. A meeting between Hanson, Bacon and Lund occurred to discuss Bacon's behavior but nothing was resolved. Bacon was apparently still incensed by the memo and continued to engage in unacceptable, confrontational behavior.

After considering Bacon's behavior and attitude, on September 16, 1994, GPM made a decision to transfer Bacon out of the marketing department. Hanson and Paul Drummond, Vice President of marketing met with Bacon that day to explain that due to the events of that week, his low productivity and poor attitude, his services would no longer be needed in the marketing department. They also discussed with Bacon the possibility of a transfer, a possibility that Bacon himself had already explored on his own. During this

meeting, Bacon did not mention any mental, emotional, or physical problems, nor did he give any excuses for his behavior.

On September 19, 1994, Bacon met with Jim Jones, the Human Resource Manager of GPM. During that meeting, Bacon informed Jones that he had been transferred out of the marketing department due to poor performance. Jones offered Bacon three different positions with the company. Bacon indicated that he would have to think about it and get back to him. According to GPM, at least one of those jobs would have enabled Bacon to immediately earn the same or more money than he was making in the marketing department and still retain the same fringe benefits. On October 3, 1994, Bacon informed Jones that he did not want any of the jobs offered to him and that he quit.

During September of 1994, Bacon was living by himself in an apartment. Bacon had no problems taking care of himself—he had no problems walking, seeing, hearing, speaking, or breathing. In addition to working full-time for GPM, Bacon was enrolled in college and taking fifteen credit hours.[3] As of September 16, 1994, no physician had restricted or limited his ability to work and during the entire year he had missed only one full day of work.

During September of 1994, no one in GPM's management knew that Bacon suffered from any disability or considered him to suffer from a disability. After he was hospitalized at Prairie View, and during the entire time he was employed at GPM, Bacon never told Linda Hanson about the outcome of his treatment or any accommodations that he required to perform his job duties. At no time while he worked under Linda Hanson's supervision did Bacon inform her about any of his physical or mental problems. Hanson did, however, have a vague idea that Bacon was having familial problems, but he did not confide in her about them. Nor did Bacon inform Lund that he was suffering from a disability. Lund did not consider Bacon disabled or that he had a disability that needed accommodation. No physician ever informed GPM that Bacon suffered from any disability.

In short, GPM attributed Bacon's work problems to a personality conflict with Hanson and to what it perceived to be a mediocre work ethic.

Bacon admits that as of September 28, 1994, no physician restricted him from working in any way and that no physician had communicated any such restriction to GPM. No counselor or physician has restricted the type of work that he can do.

## ADA

"Enacted in 1990, the ADA is designed to level the playing field for the more than 43,000,000 Americans who have one or more physical or mental disabilities." *Schmidt v. Methodist Hosp. of Indiana, Inc.,* 89 F.3d 342, 344 (7th Cir.1996). "The ADA and its attendant regulations were enacted, in part, to address perceived inadequacies in the Rehabilitation Act of 1973, 29 U.S.C. § 794." *Hutchinson v. United Parcel Service, Inc.,* 883 F.Supp. 379, 387 (N.D.Iowa 1995). In its findings, Congress concluded that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Congress also found that "individuals with disabilities continually encounter various forms of discrimination,." 42 U.S.C. § 12101(a)(5). One of the purposes of the ADA was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). *See Hutchinson,* 883 F.Supp. at 390 (thoroughly discussing the history of the ADA). However, "[t]he ADA is not a job insurance policy, but rather a congressional scheme for correcting illegitimate inequities the disabled face." *Hedberg,* 47 F.3d at 934. "The ADA became effective on July 26, 1992, and it does not apply retroactively." *Garcia–Paz v. Swift Textiles, Inc.,* 873 F.Supp. 547, 557 (D.Kan.1995).

---

**3.** Bacon achieved a 3.95 or 4.0 grade point average for the 12 semester hours completed as a full-time student between September of 1994 and January of 1995.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "The term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

■ "To maintain a claim for wrongful discharge under the ADA, a plaintiff must demonstrate (1) that [he] is a disabled person within the meaning of the ADA; (2) that [he] is able to perform the essential functions of the job with or without reasonable accommodation; and (3) that the employer terminated [him] because of her disability." *Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170, 1173 (10th Cir.1996). *See White v. York Int'l Corp.,* 45 F.3d 357, 360–61 (10th Cir.1995) ("Accordingly, to qualify for relief under the ADA, a plaintiff must establish (1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is, with or without reasonable accommodation (which he must describe), he is able to perform the essential functions of the job; and (3) that the employer terminated him because of his disability."); *Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1123 (10th Cir.1995).

"The ADA does not define the term 'major life activities'" as used in 42 U.S.C. § 12102(2)(A). However, "[t]he ADA regulations adopt the definition of 'major life activities' found in the Rehabilitation Act regulations, 34 C.F.R. § 104." *Bolton v. Scrivner, Inc.,* 36 F.3d 939, 942 (10th Cir.1994), *cert denied,* —— U.S. ——, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995). "The term means func-

tions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id. (quoting* 29 C.F.R. § 1630.2(i)).

To demonstrate that an impairment "substantially limits" the major life activity of working, an individual must show "significant[ ] restriction in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Id.* 1630.2(j)(3)(i) (emphasis added). The regulations specify that "the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.*

*Bolton,* 36 F.3d at 942. *See MacDonald v. Delta Air Lines, Inc.,* 94 F.3d 1437 (10th Cir.1996).

The Tenth Circuit "has endorsed a two-part analysis" for determining whether a person is qualified under the ADA:

First, we must determine whether the individual could perform the essential functions of the job, *i.e.,* functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

*Milton,* 53 F.3d at 1123 (*quoting White,* 45 F.3d at 361–62) (*quoting Chandler v. City of Dallas,* 2 F.3d 1385, 1393–94 (5th Cir.1993), *cert denied,* 511 U.S. 1011, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994)).

Under the ADA the term "discriminate" includes an employer's "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). *See Lowe,* 87 F.3d at 1174. "It is plain enough what 'accommodation' means. The employer must be willing to consider making changes in its

ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work." *Vande Zande v. State of Wis. Dept. of Admin.*, 44 F.3d 538, 542 (7th Cir.1995).

The term "reasonable accommodation" may include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

### Burden of Proof under the ADA

■ "Plaintiff has the burden to establish that he is 'disabled' and 'qualified' to perform the essential functions of the job either with or without reasonable accommodation." *Dutton v. Johnson County Bd. of County Com'rs,* 859 F.Supp. 498, 504 (D.Kan. 1994); *see. Tyndall v. National Educ. Centers,* 31 F.3d 209, 213 (4th Cir.1994) ("Plaintiff bears the burden of demonstrating that she could perform the essential functions of her job with reasonable accommodation.").

Once the plaintiff produces evidence sufficient to make a facial showing that accommodation is possible, the burden of production shifts to the employer to present evidence of its inability to accommodate. (citations omitted). If the employer presents such evidence, the plaintiff may not simply rest on his pleadings. He "has the burden of coming forward with evidence concerning his individual capabilities and suggestions for possible accommodations to rebut the employer's evidence." *Prewitt v. United States Postal Serv.,* 662 F.2d 292, 308 (5th Cir. Unit A 1981); *see Mason,* 32 F.3d at 318; *Chiari v. City of League City,* 920 F.2d 311, 318 (5th Cir. 1991). As with discrimination cases generally, the plaintiff at all times bears the ultimate burden of persuading the trier of

fact that he has been the victim of illegal discrimination based on his disability. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–511, 113 S.Ct. 2742, 2747–49, 125 L.Ed.2d 407 (1993) (citations omitted).

*White,* 45 F.3d at 361.

### Analysis

■ Bacon has failed to present sufficient evidence for a rational factfinder to conclude that he suffered a disability within the meaning of the ADA. Although Bacon was diagnosed with major depression prior to 1994, nothing submitted by Bacon suggests that the depression previously diagnosed substantially limited one or more of the major life activities at the time he left GPM's employment. Bacon has not submitted sufficient evidence for a rational factfinder to conclude that his mental condition in 1994 significantly restricted his ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. Consequently, GPM is entitled to summary judgment.

■ Assuming, *arguendo,* that Bacon was disabled, Bacon has not produced sufficient evidence for a rational factfinder to conclude that GPM knew that Bacon had a disability. The courts have uniformly held that "[w]ithout notice of a disability, an employer cannot be liable for discrimination against an employee on the basis of his disability." *Thomas v. General Motors Corp.,* 98 F.3d 1344 (7th Cir.1996) (unpublished but available on Westlaw at 1996 WL 583386). In addressing this issue, the Eighth Circuit has stated:

> The ADA requires an employer to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified employee with a disability. See 42 U.S.C. S 12112 (Supp. V 1993); 29 C.F.R. S 1630.9 (1994)....

> Before an employer must make accommodation for the physical or mental limitation of an employee, the employer must have knowledge that such a limitation exists. The Interpretative Guidance on Title I of the ADA states that "an employer [is not] expected to accommodate disabilities

of which it is unaware." 29 C.F.R. app. S 1630.9 (1994). The logic of this proposition is overwhelming and has been affirmed repeatedly by other courts construing both the ADA and the Rehabilitation Act of 1973.

*Miller v. National Cas. Co.*, 61 F.3d 627, 629–30 (8th Cir.1995) (citations omitted); *see Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130 (7th Cir.1996) ("An employee has the initial duty to inform the employer of a disability before ADA liability may be triggered for failure to provide accommodations—a duty dictated by common sense lest a disabled employee keep his disability a secret and sue later for failure to accommodate. Thus the Act requires only reasonable accommodations 'to the known physical or mental limitations' of an employee. 42 U.S.C. S 12112(b)(5)(A) (emphasis added). An employer that has no knowledge of an employee's disability cannot be held liable for not accommodating the employee.").

In *Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928 (7th Cir.1995), the Seventh Circuit offered these observations that are relevant to the case at bar:

> Employers fire people every day. Perhaps the most common criterion for choosing whom to fire is which employees perform a job better or worse than others. Allowing liability when an employer indisputably had no knowledge of the disability, but knew of the disability's effects, far removed from the disability itself and with no obvious link to the disability, would create an enormous sphere of potential liability. Tardiness and laziness have many causes, few of them based in illness. The ADA hardly requires that merely because some perceived tardiness and laziness is rooted in disability, an employer who has not been informed of the disability, and who has no reason to know of the disability, is bound to retain all apparently tardy and lazy employees on the chance that they may have a disability that causes their behavior. The ADA does not require clairvoyance.

47 F.3d at 934.

Based upon the paucity of evidence suggesting that Bacon was in fact disabled, it is clear that GPM did not know that he was disabled. No one at GPM was apprised of Bacon's claimed "disability" until well after he left the company. GPM reasonably attributed Bacon's inappropriate behavior and inability to complete tasks to personality traits rather than a disability, and nothing presented by Bacon suggests otherwise.

To the extent GPM was aware of Bacon's symptoms prior to transferring him out of the marketing department, those symptoms were not "so obviously manifestations of an underlying disability that it would be reasonable to infer that [his] employer actually knew of the disability." *Hedberg*, 47 F.3d at 934. *See Miller*, 61 F.3d at 630 (defendant was not obligated to divine the presence of a disability from plaintiff's extended absence from work and the company's knowledge that she was in some sort of stressful family situation).

IT IS THEREFORE ORDERED that GPM's motion for summary judgment (Dk. 23) is granted.