**Larry L. REBARCHEK, Plaintiff,**

v.

**THE FARMERS COOPERATIVE ELEVATOR AND MERCANTILE ASSOCIATION, a Kansas Corporation, Defendant.**

**No. 97–1282–WEB.**

United States District Court, D. Kansas.

March 8, 1999.

**1146**

John L. Carmichael, Wilson, Lee & Gurney, Wichita, KS, for plaintiff.

Ward E. Loyd, Garden City, KS, Alan L. Rupe, Georgina R. Adami, Husch & Eppenberger, Wichita, KS, for defendant.

*Memorandum and Order*

WESLEY E. BROWN, Senior District Judge.

This matter is before the court on defendant Farmers Cooperative's motion for summary judgment. The court finds that oral argument would not assist in deciding the issues presented.

Plaintiff was employed by the defendant as branch manager of defendant's Shields, Kansas, elevator and grain storage facility, until his termination on April 24, 1995. Plaintiff brings a claim under the Americans with Disabilities Act (ADA), as well as a supplemental claim under the Kansas Act Against Discrimination (KAAD), alleging that he suffered from a disability in the form of a back condition and that the defendant discriminated against him because of the disability. The defendant seeks summary judgment by arguing that plaintiff's condition did not constitute a disability and that, in any event, the reason for the termination was plaintiff's allegedly poor job performance. Because the court determines as a matter of law that plaintiff has not shown he was disabled within the meaning of the ADA, the court does not reach the other issues raised by the parties.

### I. *Facts.*

The following summary of uncontroverted facts relating to plaintiff's alleged disability has been gleaned from the parties' combined thirty-seven pages of facts.

Defendant Farmers is a cooperative association with a principal office in Dighton, Kansas. Farmers operates five separate elevator and grain storage and handling facilities.

The plaintiff, Larry Rebarchek, was the branch manager of Farmers' Shields, Kansas, facility, which consists of six silos with a 665,000 bushel capacity, and a separate office/scale house.

Rebarchek was first employed in September, 1979, and became branch manager in July, 1986. He held that position until

he was discharged. The employment was at will. Floyd Barber was the general manager of the Farmers Cooperative and was plaintiff's supervisor.

In 1983, Rebarchek was involved in an accident. While cleaning the inside of a bin at one of the Coop's facilities, the rigging broke and Rebarchek fell approximately 60 feet. He broke his right leg, was hospitalized four days, and was off work approximately six weeks.

On or about January 17, 1994, plaintiff injured his back while shoveling ice or mud at the Shields facility. Rebarchek was seen for lower back pain by Dr. Chinburg, a Dighton physician, on January 18, 1994. Plaintiff apparently did not report this injury to Farmers at the time it occurred.

Rebarchek was referred to and treated by an orthopedic specialist in Wichita, Paul Stein, in the spring and summer of 1994. Stein's medical records reflect Rebarchek advised that he went through the harvest season adequately, but that he was mowing his lawn and pulling weeds in the garden and the next day he couldn't move with severe pain in his back, hip and leg. Exhibit 18, Entry for July 15, 1994.

Rebarchek was absent from work for some extended period in September, 1994.

On September 27, 1994, Rebarchek reported to Farmers that he had injured his back on January 17, 1994 as the result of scooping snow that day in the course of his employment. Farmers prepared and filed a "Form A Employers' Accident Report." The report was submitted to Farmers' compensation carrier, and the claim denied in early October of that year as not having been timely.filed. Exhibit 2.

On November 11, 1994, written notice of a workers' compensation claim on the January 17, 1994 injury was forwarded by Rebarchek's attorneys to Farmers Cooperative. On November 14, 1994, Rebarchek forwarded notice of intent to seek a preliminary hearing on the January 17, 1994 injury, under the Kansas Workers Compensation laws. Exhibit 5. A request for a full hearing was made on December 5, 1994. Exhibit 9.

On November 16, 1994, Rebarchek verbally reported to a Farmers' Coop secretary that he had re-injured his back while rolling a tarp on a truck at Shields. The General Manager of the Coop, Floyd Barber, was so advised the next day. At the time it occurred, the injury required no time lost from work, and no medical treatment. The Form A Employer's Report of the November 16, 1994 injury was made by Farmers on November 18, 1994. Exhibit 8.

When Rebarchek was clocking out after work on November 17, he was approached by Floyd Barber. Barber told Rebarchek's subordinate, Robert Mudd, to drive Rebarchek home. Rebarchek was further advised not to drive the company pickup assigned for use at the Shields elevator. Barber told Rebarchek that on Monday he was being transferred to the cooperative's elevator at Alamota, Kansas.

On November 18, 1994, Barber announced to all employees that company vehicles could no longer be used for commuting to work or for personal business.

On Monday, November 21, Floyd Barber sent Rebarchek to work at Farmers' Alamota facility. Rebarchek considered this to be a demotion. On the same day, Rebarchek's attorneys sent a demand to Farmers Cooperative and Floyd Barber, via facsimile, alleging that the actions constituted retaliation for making a workers' compensation claim and demanding that Rebarchek be returned to his position and duties at Shields.

After receiving the letter from plaintiff's attorneys, Barber followed plaintiff home. Barber was upset and angry and told Rebarchek, among other things, that he was tired of getting nasty letters from Rebarchek's attorneys.

Rebarchek was returned to Shields the next day, and remained there as the Branch Manager until his termination in April of 1995.

Plaintiff has evidence from which a jury could find that Floyd Barber retaliated

against plaintiff for filing a workers' compensation claim. According to Bentz Lewis, superintendent at Farmers' Dighton facility, Barber said in November of 1994 that he had offered to compensate Rebarchek for his back injury "under the table" and was mad at Rebarchek for refusing the offer and pursuing a workers' compensation claim instead. Barber also said, according to Lewis, that employees would not be getting every other Saturday off, as had been discussed, because of Rebarchek's workers' compensation claim, and also said that since Rebarchek couldn't perform his duties at Shields without hurting himself, he was going to be sent to Alamota where there was nothing going on. Barber also allegedly told Lewis that he had to reinstate Rebarchek as manager of the Shields' facility after receiving the letter from the attorneys and that Barber could not fight it. Lewis said that prior to the workers' compensation claim, Rebarchek and Barber had been on friendly terms, but that changed after the claim was filed.

As branch manager, Rebarchek supervised one other employee, Robert Mudd. Rebarchek's responsibilities as branch manager included maintaining the quality of grain while it was in storage. In maintaining the grain, it was important to check for "hot spots." Grain which develops hot spots can go bad by getting overheated, and lose its value by getting burned and discolored. When hot spots arose, it was important to ensure that the grain was turned and blended to keep it from getting sour, musty, or burned.

The defendant first learned of potential problems with the condition of the grain at the Shields' facility on or about September 25, 1994. Rebarchek was advised by Jim Fox in the fall of 1994 that the grain was bad. Barber called Rebarchek in and told him what he wanted done about wheat out of condition at Shields.

There is a genuine dispute between the parties as to what actions, if any, Rebarchek took to follow up on concerns about grain going bad at the Shields facility.

There is no dispute, however, that after problems with wheat going bad in the fall of 1994, it was discovered in February of 1995 that a significant amount of corn had gone bad as well. It is also undisputed that Rebarchek's assistant, Robert Mudd, failed to properly check on hot spots and did not properly move or turn the grain. The failure to properly maintain the grain caused the defendant to incur extensive losses. On March 21, 1995, Mudd and Rebarchek each received a written reprimand arising out of the loss of grain. Robert Mudd believes the reprimand was justified. Rebarchek denied that he was responsible for the problems, although he conceded there were at least 80,000 bushels of grain out of condition at the Shields facility.

Rebarchek underwent surgery for exploration and decompression of the S1 nerve root, and an L4–5 diskectomy on March 24, 1995 and was off work until April 17, 1995, when Dr. Stein released him to return to work. Dr. Stein's written release, dated April 11, 1995, stated that Rebarchek was recovering from surgery and was released for light duty subject to restrictions of

(a) no lifting more than 40 lbs.,

(b) no bending or twisting back more than halfway,

(c) no climbing ladders.

Dr. Stein's letter stated, "[h]opefully, these will be temporary restrictions" and noted that plaintiff was due for a follow-up exam in one month. Exhibit 17; Rebarchek deposition, pp. 143–144, 264.

Until he underwent surgery in March, 1995, Rebarchek had never been subject to any restrictions on what work he could perform, or how. He had never complained to Barber about any inability to do his job as branch manager at Shields. Nor had Rebarchek ever made any request for accommodation in his job; he did not need any.

When Rebarchek returned to work in April of 1995, Barber knew that Rebar-

chek would be unable to perform portions of his usual job duties. He understood that some people who had undergone back surgery were given restrictions by their doctors about what they can and cannot do and that such individuals can be disabled to varying degrees. Barber perceived that Rebarchek had at least a temporary disability associated with his back surgery and restrictions.

When Farmers later sold the corn from the Shields facility, it incurred losses of $55,000.00 on the corn alone. Barber deposition, pp. 29–30, 329. The total loss was at least $80,000.00.

After the actual sale and shipment of the spoiled corn to an ethanol plant in Garden City, Rebarchek was fired on April 24, 1995, as was Mudd, his assistant. No conversations took place between Barber and Rebarchek from the time Rebarchek was released by Dr. Stein until Rebarchek was terminated by Barber. Barber never considered Rebarchek to be unable to perform his work. Prior to terminating Rebarchek, Barber had visited with members of the Board as to whether or not Rebarchek should be terminated. Barber first discussed this possibility with the Board in October or November of 1994.

The court assumes for purposes of defendant's motion that a genuine issue of fact exists as to whether or not Barber's asserted reason for terminating plaintiff (failure to properly maintain the grain at the Shields' facility) was a pretext and whether it was the actual reason for the termination.

Following his April 1995 termination at Farmers, Rebarchek entered into a partnership which started a restaurant and bar business in Andover, Kansas, in late August or early September of that same year. He and his eventual partner traveled to Denver and Topeka to look at potential business sites.

In the Summer of 1995, Rebarchek participated in a physical therapy/work-hardening program through St. Catherine Hospital in Garden City. This rehabilitation program was not started until after the Farmers' termination. It was completed in the Fall of 1995, and Rebarchek was given a final discharge. Exhibit 22.

Rebarchek did not again see Dr. Stein until December, 1995. At that time Rebarchek had re-experienced problems with his back, and underwent a second surgery, for an L4–5 diskectomy. Exhibits 18, 24.

Rebarchek continues to work at the restaurant and bar on a regular basis, and plays golf as time and his back permit (normally once a week). The restaurant is a full-time job.

Rebarchek sought medical treatment for his back only from Dr. Stein from the time of the first surgery, and Dr. Stein never gave him any permanent restrictions or disability.

After an independent medical evaluation by Dr. Pedro Murati, on August 19, 1996, Rebarchek was given a final medical evaluation, and a release to return to work with the following permanent restrictions:

(a) No constant lifting over 10 lbs.

(b) No frequent lifting over 20 lbs., standing or walking.

(c) No occasional lifting over 30 lbs., and occasional sit, bend, climb stairs/ladders, squat, crawl, drive, or repetitive use of foot controls. Exhibit 21. Dr. Murati gave plaintiff a combined 17% whole person permanent impairment rating.

Plaintiff is a high school graduate, with no further formal education, who was employed by the defendant from the time he was 19 years old. Prior to his employment with the defendant, he worked for his father in construction and farming and at a feed yard.

Larry Rebarchek filed discrimination charges against Farmers Cooperative with the Kansas Human Rights Commission on October 20, 1995. The KHRC issued its no probable cause determination on the complaint on June 17, 1997. Rebarchek filed charges with the Equal Employment Opportunity Commission on October 19, 1995, upon identical grounds. EEOC is-

sued its no probable cause determination and right to sue notice on September 26, 1997. Exhibit 28.

On April 22, 1997 Larry Rebarchek filed suit against the defendant in the Kansas state court, alleging wrongful or retaliatory discharge. That case is currently pending in the District Court of Lane County, Kansas, Case No. 97–C–3.

The instant action was commenced on June 19, 1997.

## II. *Summary Judgment.*

The standards and procedures for summary judgment are well established and will not be fully repeated here. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In essence, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.*

## III. *ADA Claim.*

The ADA prohibits discrimination against "a qualified individual with a disability because of the disability of such individual" with regard to hiring, compensation, discharge, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Farmers argues that plaintiff's ADA claim fails because there is no evidence plaintiff was "disabled" within the meaning of the ADA.[1]

Under the ADA, a person is considered to have a disability if that individual either (A) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) has a record of such an impairment; or, (C) is regarded by the employer as having such an impairment. *See* § 12102(2).

Clearly, plaintiff's back condition was a physical impairment that affected his musculoskeletal system. *See* 29 C.F.R. § 1630.2(h). The "major life activities"[2] that may be limited by an impairment include such things as working and lifting. *See Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170, 1173 (10th Cir.1996). Defendant does not dispute that plaintiff's back condition limited his ability to work and to lift, but argues that his ability to do these things was not substantially limited. EEOC regulations define the term "substantially limits" as "unable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(i) & (ii). Three factors to be considered in making this determination are: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2).

### A. *Evidence of Disability.*

Plaintiff argues that the following facts show he was disabled: (1) prior to his

---

**1.** Defendant also argues it cannot be liable for discrimination because it had no notice of plaintiff's alleged disability. *Citing Bacon v. Great Plains Mfg., Inc.,* 958 F.Supp. 523, 530 (D.Kan.1997). Farmers was aware, however, of plaintiff's back problems and of the work restrictions issued by Dr. Stein shortly before plaintiff's termination. This evidence is suffi-

cient to overcome summary judgment on the question of notice.

**2.** Major life activities include caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, working, sitting, standing, lifting and reaching. 29 C.F.R. Pt. 1630, App.

termination, he had suffered two on-the-job injuries to his back which necessitated back surgery; (2) after his March 24, 1995 surgery, he was released by Dr. Stein to light-duty work with restrictions of: no lifting more than 40 pounds; no bending or twisting of the back more than half-way, no climbing ladders; and sitting, standing or walking for 2 hours at a time with breaks; and (3) plaintiff's permanent work restrictions imposed by Dr. Murati in August of 1996 included: no constant lifting over 10 pounds; no frequent lifting over 20 pounds; no occasional lifting over 30 pounds; and only occasional sitting, bending, climbing stairs/ladders, squat, crawl, drive, or repetitive use of foot controls. Pl. Resp. at 38–39.

■ The relevant time for determining whether plaintiff was a "qualified individual with a disability" is at the time of discharge. *Griffith v. Wal–Mart Stores, Inc.,* 135 F.3d 376, 380 (6th Cir.1998); *Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876, 884 (6th Cir.1996). Thus, plaintiff's second back surgery, in December of 1995, and the subsequent restrictions issued by Dr. Murati, are of limited significance. The relevant question is whether plaintiff was disabled in April of 1995 when he was terminated.

■ Insofar as plaintiff's ability to lift at the time of his termination is concerned, a large body of case law suggests plaintiff would not be considered disabled under the ADA. Several circuits have found that restrictions of a degree similar to plaintiff's do not constitute a substantial limit on the ability to lift or to work. *See Aucutt v. Six Flags Over Mid–America, Inc.,* 85 F.3d 1311, 1319 (8th Cir.1996) (individual with 25–pound lifting restriction was not disabled); *Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723, 726 (5th Cir. 1995) (individual with impaired arm who could not do heavy lifting or repetitive rotational movements and who had difficulty picking things up from the floor and holding things up high was not disabled); *Williams v. Channel Master Satellite Systems, Inc.,* 101 F.3d 346, 349 (4th Cir.1996)

("Like the Eighth Circuit, we hold, as a matter of law, that a twenty-five pound lifting limitation—particularly when compared to an average person's abilities—does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity."); *Colwell v. Suffolk County Police Dept.,* 158 F.3d 635, 644 (2nd Cir.1998) (individual with bad back who could not lift anything heavy or sit at his desk for long periods without breaks, and who could lift objects of only 10–20 pounds, and only stand and walk for half an hour at a time was not disabled). Plaintiff cites no evidence to show that his restrictions were significant when compared to the average person in the general population. *Cf. Reese v. Owens–Corning Fiberglas Corp.,* 31 F.Supp.2d 908 (D.Kan. 1998) (plaintiff found not disabled when he failed to offer any evidence comparing his lifting ability to the capabilities of an average person). The same is true with respect to plaintiff's ability to sit, stand and walk.

■ Moreover, the restrictions imposed by Dr. Stein in April of 1995 were given in connection with plaintiff's recovery from back surgery. A temporary disability while recuperating from surgery is generally not considered a disability under the ADA. *Gutridge v. Clure,* 153 F.3d 898, 901–902 (8th Cir.1998) (Disability under the ADA requires permanent or long-term impairments, and impairments while recovering from surgery are not evidence of a permanent disability); *McDonald v. Pennsylvania, Dep't of Public Welfare,* 62 F.3d 92, 96–97 (3rd Cir.1995) (recuperation after abdominal surgery not disability); *Evans v. City of Dallas,* 861 F.2d 846, 852–53 (5th Cir.1988) (knee injury that required surgery not disability). There is no evidence that plaintiff's impairment or Dr. Stein's restrictions were expected to be of significant duration; Dr. Stein's letter of April 11, 1995, said that "hopefully, these will be temporary restrictions" and noted that plaintiff was due for a follow-up exam in one month. *Cf.* 29 C.F.R. app. § 1630.2(j)

("temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities"). Indeed, the evidence shows plaintiff completed a rehabilitation program in the fall of 1995, and was discharged without significant restrictions. *Cf. Halperin v. Abacus Technology Corp.,* 128 F.3d 191, 199 (4th Cir.1997) (plaintiff suffering from temporary back injury not disabled for purposes of the ADA because "it is evident that the term 'disability' does not include temporary medical conditions"); *McDonald v. Commonwealth of Pennsylvania,* 62 F.3d 92, 95 (3rd Cir.1995)(plaintiff who required abdominal surgery and an absence of almost two months not disabled because of temporary nature of injury). Although plaintiff correctly points out that an impairment does not necessarily have to be permanent to constitute a disability, (*citing Aldrich v. Boeing Co.,* 146 F.3d 1265, 1270 (10th Cir. 1998)), the regulations nevertheless indicate that temporary conditions are not ordinarily regarded as disabilities unless they are severe and their duration is indefinite or unknowable or is expected to be at least several months. *See id.* There is simply no evidence here that plaintiff's condition was expected to be severe or long-term. *Cf. Aldrich,* 146 F.3d at 1270 (no disability where plaintiff's doctor characterized impairment as being of short duration and negligible long-term impact).

Finally, insofar as the ability to work is concerned, plaintiff has not cited any evidence concerning the geographical area to which he had reasonable access; the number and types of jobs utilizing similar training, knowledge, skills or abilities in that area from which plaintiff was allegedly disqualified because of his back condition; or the number and types of other jobs from which plaintiff was disqualified. *Cf.* 29 C.F.R. § 1630.2(j)(3)(ii) (listing factors relevant to major life activity of working). Plaintiff simply asserts without citing any evidence that Dr. Stein's restrictions "effectively took him out of the manual labor market." Pl. Resp. at 39. *Cf. Joyce v. Fed. Express Corp.,* No. 97–

2098, 1998 WL 709610 at *4 (D.Kan., Aug.28, 1998) (plaintiff's conclusory statement that her 20–pound lifting restriction and "sedentary work capacity" restriction prevent her from performing any heavy or medium-labor jobs are not sufficient to show plaintiff is substantially limited in her ability to work.)

In sum, plaintiff has failed to cite evidence from which a reasonable jury could find that his impairment constituted a disability under the ADA. Nothing has been cited to establish that plaintiff's back injury was of such severity to render him substantially limited in the ability to lift or to work. There is no evidence in the record comparing his condition to the average person in the general population. The uncontroverted facts show that his back injury required surgery and he was given certain restrictions while recovering from surgery, but there is no evidence that his restrictions were expected to be permanent or that his condition was expected to result in a permanent or long-term impairment of his ability to engage in major life activities.

**B.** *Record of Disability.*

Plaintiff also contends he was disabled because he had a record of an impairment meeting the definition of disability. Pl. Resp. at 40. He fails to cite any facts, however, to establish a record of such an impairment. The mere fact that plaintiff may have previously missed some unspecified amount of work due to his back condition does not establish a disability.

**C.** *Regarded as having a disability.*

Finally, plaintiff contends he meets the ADA's definition of disabled because there is evidence his employer regarded him as being substantially limited in the major life activity of working. *See* 42 U.S.C. § 12102(2)(C).

In determining whether a plaintiff is "regarded as having an impairment" which substantially limits his ability to

work, the focus is on the impairment's effect upon the attitudes of others. *Sutton v. United Air Lines, Inc.,* 130 F.3d 893, 903 (10th Cir.1997). This provision "is intended to combat the effects of 'archaic attitudes,' erroneous perceptions, and myths" that work to the disadvantage of persons with, or who are regarded as having, disabilities. *Wooten v. Farmland Foods,* 58 F.3d 382, 385 (8th Cir.1995). Plaintiff argues a jury could find this provision satisfied because Mr. Barber "believed that Mr. Rebarchek had at least a temporary disability associated with his back surgery," he "perceived that individual[s] who have been given restrictions by their doctors can be disabled to varying degrees," and he "understood that individuals who had undergone back surgery could be limited in some of their major activities of daily life." Pl. Resp. at 40. These facts are insufficient to create a jury question. Mr. Barber's opinion that plaintiff had limitations on the type of work he could do upon his return from surgery was not based upon myths or erroneous perceptions about people with back injuries; it was based upon the restrictions given plaintiff by Dr. Stein. *Cf. Wooten,* 58 F.3d at 386 (no disability where employer's perception was based not upon stereotype or myth, but upon a doctor's written restriction of plaintiff's physical abilities). Nor is a material issue created by Barber's belief "that in view of Dr. Stein's restrictions Mr. Rebarchek would be unable to perform portions of his usual job duties." Pl. Resp. at 40. Plaintiff cites nothing to show that this belief was false. At any rate, "an employer does not necessarily regard an employee as substantially limited in the major life activity of working simply because it believes that individual is incapable of performing a particular job." *Sutton,* 130 F.3d at 904. Plaintiff has failed to cite any evidence that the defendant treated or regarded him as having an impairment substantially limiting his major life activities. *Cf. Welsh v. City of Tulsa,* 977 F.2d 1415, 1419 (10th Cir.1992) (affirming summary judgment where plaintiff failed to present evidence that he would be precluded not only from performing "the specific job" for which he applied, "but a wide range of jobs," if he had disability as perceived by defendant).

### IV. *Kansas Act Against Discrimination Claim.*

Plaintiff also makes a claim under the Kansas Act Against Discrimination (KAAD), K.S.A. 44–1001 et seq. Because the basis of this claim is the same as the ADA claim and the relevant KAAD provisions are virtually identical to the ADA, summary judgment is likewise appropriate on plaintiff's KAAD claim. *See Aramburu v. Boeing Co.,* 112 F.3d 1398, 1403 n. 3 (10th Cir.1997) (applying same standards and burdens to plaintiff's ADA claims and KAAD claims) (citing *Woods v. Midwest Conveyor Co.,* 231 Kan. 763, 767, 648 P.2d 234 (1982)).

### V. *Conclusion.*

Defendant Farmers Cooperative's Motion for Summary Judgment (Doc. 32) is hereby GRANTED and the action is dismissed. IT IS SO ORDERED this 8th day of March, 1999, at Wichita, KS.