Pearl Laverne BURNETTE, et al.,
Plaintiffs–Appellants,

v.

DOW CHEMICAL COMPANY, Nalco
Chemical Company, and Independent
Tank Company, Defendants–Appellees.

Ronald Eugene TATE, et al.,
Plaintiffs–Appellants,

v.

DOW CHEMICAL COMPANY, Nalco
Chemical Company, and Independent
Tank Company, Defendants–Appellees.

No. 86–2450.

United States Court of Appeals,
Tenth Circuit.

June 13, 1988.

Bruce W. Pitzer, Oklahoma City, Okl. (Law Offices of John W. Norman, Inc., on the brief) for appellants.

John P. Woolf, Wichita, Kan. (Triplett, Woolf & Garretson, on the brief) for appellee Dow Chemical Co.

Kurt A. Harper, Wichita, Kan. (Sherwood, Hemsley & Harper, on the brief) for appellee Nalco Chemical Co.

Clifford L. Malone, Wichita, Kan. (Laura L. Ice, and Adams, Jones, Robinson and Malone, on the brief) for appellee Independent Tank Co.

Before LOGAN, SEYMOUR and TIMBERS,[*] Circuit Judges.

TIMBERS, Circuit Judge.

Appellants Pearl Laverne Burnette, Gerald C. Burnette, Mark W. Krusor, Ronald Eugene Tate, Donna Jean Tate, Harold Dean Tally, John H. Tally, Jamie R. Tally and William B. Tally ("appellants" collectively) appeal, pursuant to a Fed.R.Civ.P. 54(b) certification, from an order entered August 15, 1986 in the District of Kansas, Sam A. Crow, *District Judge*, granting the motions for summary judgment of Dow Chemical Co. ("Dow"), Nalco Chemical Co. ("Nalco") and Independent Tank Co. ("Independent").[1]

On June 17, 1981, a storage tank exploded at a refinery operated by the Total Petroleum Co. ("Total") in Arkansas City, Kansas while it was being filled with the chemical diethanolamine LFG ("DEA"). When the tank ruptured, hot DEA was spewed onto Ronald Tate, Gerald C. Burnette and Betty Tally. Tate survived, but approximately 59% of his body was covered with burns. Tally died ten days after the explosion. Burnette died July 21, 1981, one month and three days after the explosion.

On appeal, appellants claim with respect to Nalco, that (1) as the seller and apparent manufacturer of the tank, Nalco owed a duty to appellants; (2) there were issues of material fact regarding the design and construction of the tank and the cause of the accident; (3) there was no unforeseeable misuse of the tank; and (4) Nalco's failure to warn and any causal connection was a jury issue. With respect to Independent, appellants claim that (5) Total's misuse of the tank was not unforeseeable as a matter of law; (6) the construction and design of the tank contributed to its rupture; and (7) the trial court improperly applied the stan-

---

[*] Of the Second Circuit, by designation.

[1]. Another defendant in the district court, Dresser Industries, Inc., pursuant to 28 U.S.C. § 1292(b) (Supp.III 1985), cross-appeals from the August 15, 1986 order denying its motion for

summary judgment. We address the issues raised by that appeal in a separate opinion filed today. *Burnette v. Dresser Industries, Inc.,* 849 F.2d 1277 (10th Cir.1988).

dard for granting summary judgment in a products liability case. With respect to Dow, appellants claim that (8) the DEA as shipped by Dow required an adequate warning; and (9) the DEA, which was heated to 140° F, contributed to appellants' deaths.

We hold that the district court correctly granted summary judgment in favor of Nalco and Independent, but erred in granting summary judgment in favor of Dow.

For the reasons which follow, we affirm in part and vacate and remand in part.

### I.

The basic facts and prior proceedings are set forth in detail in our opinion filed today in *Burnette v. Dresser Industries, Inc.*, *supra*, familiarity with which is assumed. We shall summarize here only those additional facts and prior proceedings believed necessary to an understanding of the issues raised on the instant appeal.

The tank originally was manufactured by Independent as an atmospheric tank, i.e., a tank to be used to store substances at a pressure of about 0.5 psi or less. The tank had three openings, a 4–inch one on top, a 2–inch one on top, and a 2–inch connection for draining on the bottom. Atmospheric tanks are supposed to be vented with such openings. Independent had the tank tested to withstand pressure of up to 5 psi, to ensure that it would not leak. It had no further contact with the tank after it was delivered to Nalco in 1978. Total's engineer, Steve Long, testified that the tank was adequate as an atmospheric storage tank.

Shortly after the tank arrived, Total modified it by adding a manhole, installing steam heating coils inside the tank's bottom, adding glass gauges on the outside, and covering it with insulation. Total then used the tank as an atmospheric tank to store pour point depressant until April 1980. At that time, Total converted the tank to a pressure tank to store DEA. It converted the tank to a closed system (i.e., lacking vents), so that the DEA could be covered with a blanket of natural gas. Total closed the top vent and installed a pres-

sure relief valve set to relieve at 6 psi. The tank was filled with DEA three times: (1) at the time of the conversion in April 1980, (2) in April 1981, and (3) on the day of the accident.

When tested after the accident, the relief valve did not open until pressure reached 148 psi. Steve Long testified that he had calculated the pressure in the storage tank at the time it ruptured to have been 47 psi. He stated that if the relief valve had functioned properly, relieving the pressure at 6 psi, the "system would have worked". Appellants' expert, George Stanton, also testified that, if the valve had opened, the tank would not have burst. Independent's expert, John A. Sevart, testified that the "sole cause of the accident was the failure of the pressure relief valve to adequately relieve at 6 psi."

The safety standards of the Underwriters' Laboratory, Inc. apply to tanks built to hold flammable substances like the one here involved. The standard known as UL 142 requires steel plate thickness of .25 inch; three pieces of construction material; and a nameplate. UL 142 requires the nameplate to include a statement that "This tank requires emergency relief venting. Capacity not less than ___ cubic feet per hour." The tank that ruptured had a thickness of .18 inch; had four pieces of construction material; and lacked a nameplate. Moreover, the tank had defective welds.

Although the tank indisputably failed to meet the standards of UL 142, the record contains some evidence to suggest that these lapses were not causally connected to the accident. Sevart testified that none of these defects, alone or combined, caused the accident. He stated that "Even if those various manufacturing specifications had been satisfied, the rupture still would have occurred by reason of the excessive pressure present within the tank." Moreover, had the tank been affixed with the requisite nameplate, under UL 142 the nameplate would only have warned about the need for emergency relief venting. Had appellants checked, they would have

found that the tank, at least apparently, had the capacity for such venting—i.e., the relief valve which ultimately malfunctioned.

The DEA was manufactured by Dow in Louisiana. It was transported to Total by National Bulk Transport, Inc. ("National"). At the time the DEA left the Dow plant, it was heated to 140° F. Dow's Transportation Equipment Data Sheet recommends a loading temperature of 100° F. One of the victims, Ronald Tate, had improperly turned up the heat in the tank that ruptured so that the temperature of the chemical already in the tank was 220° F.

National's truck driver, Don Pendergrass, gave a Total employee the papers accompanying the DEA shipment, including (1) the DEA product label, (2) a material safety data sheet ("safety sheet"), and (3) an emergency response information sheet ("emergency sheet"). The product label stated that DEA "CAUSES SKIN IRRITATION"; warned to "Avoid Contact with Skin and Clothing"; and counseled, "In cases of contact, immediately flush eyes with plenty of water for at least 15 minutes. Call a physician. Flush skin with water. Wash clothing before reuse." The safety sheet warned against repeated prolonged exposure to the skin and, depending on the extent and severity of likely exposure, recommended wearing protective clothing and impervious gloves, boots and aprons. The emergency sheet labeled DEA as "IRRITATING". It listed as a hazard to skin: "UP TO MODERATE IRRITATION, EVEN A BURN ON REPEATED CONTACT." It recommended as first aid for the skin: "IMMEDIATELY FLUSH WITH PLENTY OF WATER FOR AT LEAST 15 MINUTES WHILE REMOVING CONTAMINATED CLOTHING. CONSULT MEDICAL PERSONNEL."

Dow had attached a duplicate emergency sheet and DEA product label to the outlet valve of the truck used to transport the DEA. Total had a copy of the safety sheet on file. Its employees knew that protective clothing should be worn when loading the chemical.

Tate was wearing gloves and safety glasses, but not impervious boots or an apron. He stated that he would have worn no additional clothing regardless of the temperature of the DEA in the storage tank. Tate knew the temperature of the DEA in the storage tank; he recorded in a log book that it had a temperature of 220° F. The DEA that spewed onto the three victims came from the storage tank. It was a mixture of the DEA already in the tank and the new DEA from the truck. The temperature of the DEA was measured from drums outside the truck one hour after the explosion. It had a temperature of 132° F. The heat loss due to the transfer to the drums was estimated at 1–2° F.

DEA is not listed as a hazardous substance under Department of Transportation ("DOT") Regulations. 49 C.F.R. § 172.101 (1987). The record before us does not indicate a definition of "hazardous". Under DOT regulations, however, a chemical is considered "corrosive" when it "causes visible destruction or irreversible alterations in human skin tissue at the site of contact...." 49 C.F.R. § 173.240 (1987).

DEA is an alkaline chemical. The National Safety Council Data Sheet #523 states, "Both thermal burns and chemical burns destroy body tissue. But a chemical will continue to cause damage until reaction with body tissue is complete or until the chemical is washed away with water. Strong alkalies will penetrate tissue deeply...." According to Tate's treating physician and appellants' medical expert, Dr. Leo Lowbeer, the burns were both chemical and thermal in nature. Dr. Lowbeer stated that DEA at 135° F will cause second and third degree burns within 20–30 seconds. He also stated, "In this case, there is a potential additional burning and caustic effect of the spilled substance, [DEA], a viscous, extremely alkaline substance, with a pH of 11 (neutral pH is 7), clinging to the skin." He added that DEA would be "erosive even at room temperature." A staff doctor for Dow, Dr. Paul J. Brownson, stated in a letter to appellants' expert, "Obviously [DEA] has significant liver and renal toxicity when absorbed in significant

amounts. From the engulfing type exposure, I would expect massive absorption."

Dow tested DEA for its toxic effects. It conducted these tests at room temperature.

After discovery was completed and a pretrial order had been entered, Nalco, Independent and Dow moved for summary judgment. In an order entered August 15, 1986, the district court granted the motions of Nalco, Independent and Dow. On September 8, 1986, the court entered final judgment in favor of these three defendants. This appeal followed.

## II.

We review a district court order granting or denying summary judgment pursuant to the same standard applied by the district court, that is, whether there is a genuine issue of material fact and whether the movant is entitled to judgment as a matter of law. 10 Wright & Miller, Federal Practice and Procedure § 2716, at 643 (1983). We must view the facts and inferences to be drawn from the record in the light most favorable to the nonmoving party. *Id.* Even under this standard there are cases where the evidence is so weak that the case does not raise a genuine issue of fact. As stated by the Supreme Court, "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1).

The Supreme Court recently has explicated the standard to be used in summary judgment cases, emphasizing that "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). The Court stated that the question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

To prevail against defendants' motions for summary judgment, appellants were required to establish a prima facie case of negligence or strict liability and were required to "produce proof of three elements: (1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed at the time it left the defendant's control." *Mays v. Ciba–Geigy Corp.*, 233 Kan. 38, 54, 661 P.2d 348, 359 (1983).

After careful review of the record in the instant case in light of these elements, we hold that, with respect to Nalco and Independent, the evidence was so "one-sided" that these defendants must prevail as a matter of law. With respect to Dow, however, we hold that the evidence raises a genuine issue of material fact and that summary judgment was granted improperly.

## A.

We turn first to the claims against Nalco. In the pretrial order, appellants stated their claims against Nalco on four theories: (1) failure to mark the tank that ruptured; (2) manufacturing defects in the tank; (3) design defects in the tank; and (4) failure to warn.

The district court held that Nalco was entitled to summary judgment essentially because (1) it found that, because Nalco did not in fact manufacture the tank, it owed no manufacturing duty to appellants; and (2) although it found that there was an issue of fact as to whether Nalco owed design and failure to warn duties to appellants, it concluded that a jury could reach only one conclusion regarding the causal connection between the accident and the alleged design defects and the alleged failure to warn.

With respect to the design defects claim,

the court found, among other things,[2] that the defects in the tank did not cause the accident and that the evidence was insufficient to raise a question of fact as to whether Nalco should have foreseen the particular use of its product—i.e., conversion to a pressure tank.

With respect to the failure to warn claim, the court found that, even if appellants had been warned of the need for emergency venting, there was no evidence that the accident could have been prevented. The court stated that:

"Had [appellants] been warned of the need for emergency ventilation, and heeded that warning, they would have discovered through their own observation an emergency relief valve and through Steve Long that there was adequate venting capacity. [Appellants] offer no evidence that such a warning would have resulted in [their] discovery of the malfunctioning emergency relief valve or would have prevented [their] injuries."

It is of sufficient importance to bear repeating that appellants *now* claim that: (1) as the seller and "apparent manufacturer" of the tank, Nalco owed a duty to them; (2) there were issues of material fact regarding the design and construction of the tank and the cause of the accident; (3) there was no unforeseeable misuse of the tank; and (4) Nalco's failure to warn and any causal connection was a jury issue. As Nalco correctly points out, however, the district court found in favor of appellants on the issue of Nalco's duty regarding design and warning, holding that there was a question of material fact on this issue but granting summary judgment on the ground that there was no issue of fact on the causation issue. Thus, the court's finding on the issue of Nalco's duty regarding design and warning cannot be said to be reversible error.

■ With respect to the causation issue, appellants cite the rule of Kansas law that "the question of causation ... is one for resolution by the jury in the absence of conclusive proof that makes only one result possible." *Palmer v. Ford Motor Co.*, 498 F.2d 952, 953 (10th Cir.1974). In *Palmer*, however, we went on to state that "In a diversity case, the sufficiency of the evidence to take the case to the jury is a question of federal law." *Id.* Thus, the standards of such federal cases as *Anderson* and *Celotex*, referred to above, control the issue of causation in this diversity case. The federal standards are generally in accord with the Kansas rule in any event, since under that rule causation is a jury question only "in the absence of conclusive proof that makes only one result possible."

■ Applying these standards to the facts of this case, we conclude, and the record fully bears out, that the district court reasoned correctly that there was no genuine question of material fact regarding the causal connection between the accident and Nalco's alleged failures adequately to design the tank or to affix a nameplate warning about the need for emergency relief venting.

First, with respect to the alleged design defects, there is no evidence in the record that the tank would have ruptured if Total had not modified it in any way. The question thus is whether Nalco should have foreseen the possibility that this tank would be modified in this way. Appellants cite *Ruther v. Robins Eng'g & Constructors, a Div. of Litton Systs., Inc.*, 802 F.2d 276, 279 (7th Cir.1986) (applying Indiana law), for the proposition that questions of foreseeability of safety devices and foreseeability of harm are questions for the jury. Apart from the fact that appellants misquote *Ruther*, which actually refers to the " '*feasibility* of safety devices and the foreseeability of harm' ", *id.* (quoting *Newton v. G.F. Goodman & Son*, 519 F.Supp. 1301, 1306 (N.D.Ind.1981)), the *Ruther* court in any event tacitly assumed that there must be at least some evidence in the record to warrant submission to the jury.

**2.** The court also found that there was no evidence that the tank was unreasonably dangerous when it left the seller's hands, i.e., before the tank was modified by Total's employees into a pressure tank.

The court actually held that "there was *enough in the record to make foreseeability a jury question*." *Id.* at 280 (emphasis added).

In the instant case, by contrast, there was essentially no evidence to show that Nalco should have foreseen the conversion of its atmospheric tank into a pressure tank equipped with a malfunctioning pressure valve or that the tank would be subject to extreme internal pressure. The only evidence that conceivably could be construed to support such a proposition was that atmospheric tanks could be used in a closed system and that refineries occasionally do convert atmospheric tanks to closed systems. This scintilla of evidence was hardly sufficient to raise a question of fact as to whether a supplier of atmospheric tanks should anticipate that their tanks would not only be converted to a closed system but also would be converted to a pressure tank and subjected to extreme internal pressures caused by a malfunctioning relief valve. There was no evidence to suggest that such conversions or malfunctions are frequent or even periodic occurrences. On this record we are unwilling to require suppliers to anticipate such events.

Second, with respect to the alleged failure to warn, we agree with the district court's conclusion that the accident would have occurred even if the nameplate had been properly affixed to the tank. When appellants assert that in Kansas there is a presumption that an adequate warning will be heeded, *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 410, 681 P.2d 1038, 1057, *cert. denied*, 465 U.S. 965 (1984), they miss the point. The district court assumed that the warning on the nameplate *would* be heeded. The problem with appellants' case was that the nameplate would have cautioned only about the need for *emergency venting*. Had appellants investigated the tank, they would have found that the tank apparently *had* the capacity for such emergency venting. There is no evidence to suggest that they would have discovered that the relief valve would malfunction. Thus, on this record, we are convinced that the accident still would have occurred.

In short, any evidence on causation regarding design defects and failure to warn was so slender that no reasonable jury could have found in favor of appellants. Appellants' case against Nalco regarding causation was "so one-sided" that the district court correctly held that it raised no genuine issues of material fact.

**B.**

We turn next to the claims against Independent. In the pretrial order, appellants stated their claims against Independent on four theories: (1) failure to vent the tank; (2) manufacturing defects; (3) design defects; and (4) failure to warn. The district court held that Independent was entitled to summary judgment "for the same reasons" that supported its grant of summary judgment in favor of Nalco.

Having reviewed the record, we agree that Independent was entitled to summary judgment. For substantially the same reasons set forth in the previous section of this opinion regarding Nalco, we do not believe that on this record Independent can be held to have foreseen the modification of an atmospheric tank to a pressure tank and its subjection to extreme internal pressures. We also believe that the absence of the nameplate could not have caused the accident.

**C.**

Finally, we turn to the claims against Dow. In the pretrial order, appellants stated their claims against Dow on three theories: (1) failure to label the DEA regarding its toxic effects; (2) shipping the DEA at a temperature that was too hot; and (3) failing to label the DEA as a hazardous substance because of the conditions of the load in question.

The district court granted Dow's motion for summary judgment essentially for two reasons. First, it found that the DEA was not unreasonably dangerous because it was not dangerous to an extent beyond that which would be contemplated by the ordinary refinery worker with the ordinary

knowledge common to the community of refinery workers. *See* Restatement (Second) of Torts § 402A, comment i (1982). Second, it found that the warnings Dow sent with the DEA, which labeled it "IRRITATING" and recommended immediate flushing with water upon contact, were adequate. Third, the court found that the heating of the DEA by Dow was of no consequence because the temperature did not unreasonably exceed expectations and any aggravation of appellants' injuries due to additional thermal burns caused by the heating would be "a matter of basic common sense". As a result, the court found that there was no need for additional warnings regarding thermal burns from heated DEA.

On appeal, appellants claim that the record raises the following questions of fact: (1) whether the warnings labelling the DEA as merely "IRRITATING" were "woefully inadequate"; (2) whether the DEA in the trailer truck was heated to 132° or 140° F; (3) whether heating the DEA would change its chemical properties and make it unreasonably dangerous; and (4) whether anyone at Total ever took the product label, the safety sheet or the emergency sheet from the National truck driver who delivered the DEA.

For the sake of brevity, we focus only on the most material of these questions of fact: whether the nature of the warnings given in the DEA product label, the safety sheet and the emergency sheet were adequate. These information sheets stated only that the DEA could cause "up to moderate skin irritation"; they recommended that impervious clothing should be worn only in certain circumstances creating a likelihood of relatively severe and extended exposure; and they warned against only "prolonged and repeated exposure to the skin." It is undisputed that two employees died, and one employee was severely injured after coming into contact with the DEA. While the death and severe injuries were due to both chemical and thermal burns, they at least in part were the result of the chemical burns. The record established that the DEA is a strong alkaline chemical and that "Strong alkalies pen-

etrate [human tissue] deeply." There was evidence that the fact that the DEA clings to the skin contributed to the injury, and that it has significant liver and renal toxicity. We believe that a jury should have been permitted to decide whether, in light of this evidence, the description of the DEA as merely "irritating" was an adequate warning.

It is true that the DEA is not listed as a "hazardous" material by the DOT. Since there is no definition of "hazardous" in the record, however, there is an issue as to whether the DEA, while not "hazardous", was much more than "irritating". The record shows that DEA was "erosive even at room temperature." Thus, there is a question of fact whether the DEA was "corrosive". As defined in 49 C.F.R. § 173.240, "corrosive" describes a substance that "causes visible destruction or irreversible alterations in human skin tissue". While the record does not indicate that corrosive materials must be so labeled, we believe that the jury should have been permitted to decide whether the DEA met the definition of corrosive, and, if so, whether a chemical that "causes visible destruction or irreversible alterations in human skin tissue" should have been given a label stronger than "irritating".

In short, we hold that the record raises genuine issues of material fact regarding the adequacy of the warnings which accompanied the DEA.

### III.

To summarize:

We hold that the district court correctly granted summary judgment in favor of Nalco and Independent, but erred in granting summary judgment in favor of Dow.

Accordingly, we affirm those parts of the August 15, 1986 order that granted summary judgment in favor of Nalco and Independent; but we vacate that part of the order that granted summary judgment in favor of Dow and we remand the case as to Dow to the district court for trial on the

merits.[3]

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

---

**3.** Of course, on remand all facets of appellants' claims against Dow will be before the court— not just the adequacy of the warnings discussed above.