**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 20 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ARVINE HINER,

      Plaintiff-Appellant,

v.

DEERE AND COMPANY, INC.,

      Defendant-Appellee.

No. 01-3335

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 99-CV-4025-DES)**

John Gehlhausen, Lamar, Colorado (Kevin Diehl, Topeka, Kansas, with him on the briefs), for Plaintiff-Appellant.

Peter F. Daniel, of Lathrop & Gage L.C., Kansas City, Missouri (Tammy M. Somogye, Overland Park, Kansas, with him on the brief), for Defendant-Appellee.

Before **MURPHY** , **BALDOCK** , and **HARTZ** , Circuit Judges.

**HARTZ** , Circuit Judge.

      This appeal arises from a product-liability suit governed by Kansas

law. Plaintiff Arvine Hiner suffered injuries in a farming accident involving a

tractor and front-end loader manufactured by Defendant Deere and Company. Plaintiff's complaint alleges that the tractor and loader were defective in design and that Deere failed to issue adequate warnings concerning risks posed by the equipment. The district court granted Deere's motion for summary judgment. Plaintiff appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part and reverse in part.

## I. **Background**

We view the evidence in the light most favorable to the party opposing summary judgment. *Mattioda v. White*, 323 F.3d 1288, 1291 (10th Cir. 2003). Plaintiff's accident occurred on January 2, 1998, while he was operating a Deere 4020 tractor. The tractor was equipped with a Deere Model 48 front-end loader. Plaintiff purchased the tractor and the front-end loader from another farmer in 1979. The tractor had been manufactured in 1964, and the front-end loader had been manufactured in 1972. The front-end loader consists of two arms attached to a loader bucket. The arms can be raised and lowered by hydraulic power, using levers at the tractor seat.

At the time of the accident, Plaintiff was using the loader to carry a large round hay bale. Intending to transport the bale across his pasture to a cattle feeder, he began driving with the bale about one-and-a-half feet off the ground. As he drove, he looked off to the side at some cattle walking toward him. While

his attention was diverted, the front-end loader began rising upward. The hay bale, which had been resting unrestrained on the front-end loader, rolled backward onto Plaintiff. The accident rendered him paraplegic.

The type of hay bale that fell on Plaintiff—a large round bale—was not introduced into the farming industry until the fall of 1972 or the spring of 1973. Plaintiff adapted his front-end loader so that it could be used to transport large round bales. He welded brackets, or "ears," onto the bucket and then used these brackets to attach bale forks to the bucket. He also welded a backstop onto the bucket. When Plaintiff carried a large round bale with his loader, the bale would rest on top of the forks.

The basic hazard involved in Plaintiff's accident—the hazard of objects falling off loaders onto tractor operators—predates the introduction of large round bales. According to Plaintiff, however, the increasing use of large round bales exacerbated the dangers associated with using front-end loaders, because injuries resulting from large-round-bale accidents are especially severe. Deere and other manufacturers have responded to the danger of large-round-bale roll-down accidents by offering for sale a number of safety devices which reduce the risk of injury. One such safety feature is a roll-over protection system (ROPS) to which a canopy can be attached. The canopy prevents objects from falling onto the

operator. Other safety devices include bale grapples and bale spears—specialized equipment used to secure large round bales on front-end loaders.

Although Plaintiff knew about the hazards of roll-down accidents and was familiar with the available safety devices, he believed that he could avoid the falling-object danger by carrying his load at a low level. At the time of his accident, however, the front-end loader elevated on its own—it rose "without conscious operator input." As will be discussed in greater detail below, Plaintiff did not know that such "self-raising" was possible and his lack of awareness of that possibility may have interfered with his ability to assess the risks of using the tractor and loader to carry large round bales.

Plaintiff filed suit against Deere, relying on both negligence and strict-liability theories. He alleged that Deere failed to issue sufficient warnings about the risks of roll-down accidents. He also alleged that the tractor and loader were defective in design, because they lacked certain safety devices that would have prevented his injuries. Deere filed a motion for summary judgment, which the district court granted as to all Plaintiff's claims.

Plaintiff appeals the summary judgment. Because this is a diversity case, we apply the substantive tort law of Kansas. We follow federal law, however, regarding the standard for granting summary judgment. *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1016 (10th Cir. 2001). Accordingly, "[w]e review the entry

-4-

of summary judgment de novo, drawing all reasonable inferences in favor of the nonmovant[]. The moving party must show there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law." *Boykin v. ATC/VanCom of Col., L.P.*, 247 F.3d 1061, 1063 (10th Cir. 2001) (internal citations and quotation marks omitted).

## II.    Discussion

"Kansas law recognizes three ways in which a product may be defective: (1) a manufacturing defect; (2) a warning defect; and (3) a design defect." *Delaney v. Deere & Co.*, 999 P.2d 930, 936 (Kan. 2000). Plaintiff relies on both warning-defect and design-defect theories in asserting that Deere bears liability for his injuries. We first consider Plaintiff's warning-defect claims.

### A.    Warning-defect claims

Under Kansas law, "[a] product, though perfectly designed and manufactured, may be defective if not accompanied by adequate warnings of its dangerous characteristics." *Meyerhoff v. Michelin Tire Corp.*, 70 F.3d 1175, 1181 (10th Cir. 1995). The Kansas courts have cited the Restatement (Second) of Torts § 388 (1965) as authority for "[t]he general rule regarding a manufacturer's duty to warn." *Long v. Deere & Co.*, 715 P.2d 1023, 1029 (Kan. 1986). Section 388 states:

One who supplies . . . a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel . . . for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Two aspects of the warning-defect cause of action are the focus of the dispute in this appeal. First, what is the relevance of the user's knowledge of danger? Second, what is the scope of the manufacturer's duty, if any, to warn of dangers discovered *after* the item has been sold?

We begin with the relevance of the user's knowledge. Under paragraph (b) of § 388, there is no duty to warn of an obvious danger. Similar limitations appear in the Kansas Product Liability Act. K.S.A. § 60-3301, et seq. Section 60-3305 provides:

In any product liability claim any duty on the part of the manufacturer or seller of the product to warn or protect against a danger or hazard which could or did arise in the use or misuse of such product, and any duty to have properly instructed in the use of such product shall not extend: (a) To warnings, protecting against or instructing with regard to those safeguards, precautions, and actions which a reasonable user or consumer of the product, with the training, experience, education and any special knowledge the user or consumer did, should or was required to possess, could and should

-6-

have taken for such user or consumer or others, under all the facts and circumstances;

(b) to situations where the safeguards, precautions and actions would or should have been taken by a reasonable user or consumer of the product similarly situated exercising reasonable care, caution and procedure; or

(c) to warnings, protecting against or instructing with regard to dangers, hazards or risks which are patent, open or obvious and which should have been realized by a reasonable user or consumer of the product.

Accordingly, the Kansas courts have stressed that manufacturers should not be held liable for failing to warn about risks that would be apparent to ordinary users. *See, e.g., Miller v. Lee Apparel Co.*, 881 P.2d 576, 588 (Kan. Ct. App. 1994) ("A product is not unreasonably dangerous when its degree of danger is obvious and generally known or recognized. If a danger is obvious, then its obviousness constitutes a warning, and the product seller's failure to provide a separate warning should not constitute a defect." (internal quotation marks and citations omitted)). Moreover, regardless of the ordinary user's knowledge of the danger, "[t]here is no duty to warn of dangers *actually known* to the user of a product . . . ." *Long*, 715 P.2d at 1029 (internal quotation marks and citation omitted); *accord Miller*, 881 P.2d at 588).

As for the scope of a post-sale duty to warn, in *Patton v. Hutchinson Wil-Rich Mfg. Co.*, 861 P.2d 1299, 1313 (Kan. 1993), the court recognized "a manufacturer's post-sale duty to warn ultimate consumers who purchased the

-7-

product who can be readily identified or traced when a defect, which originated at the time the product was manufactured and was unforeseeable at the point of sale, is discovered to present a life threatening hazard." Two factors govern whether a manufacturer must issue a post-sale warning: "a reasonableness test and the manufacturer's actual or constructive knowledge of the risk." *Id.* at 1314. A plaintiff bringing a post-sale warning-defect claim "must make an initial showing that the manufacturer acquired knowledge of a defect present but unknown and unforeseeable at the point of sale and failed to take reasonable action to warn of the defect." *Id.*

Turning now to the specifics of Plaintiff's claims, he contends that Deere failed to warn of several dangerous characteristics of the tractor and loader and that these failures to warn contributed to his accident. He asserts the following warning-defect claims: (1) Deere should have provided post-sale warnings to the owners, operators, and dealers of Deere front-end loaders that there had been reports of roll-down accidents occurring when loaders had risen "without conscious operator input"; (2) Deere should have provided warnings regarding the need for a rollover protection system (ROPS) on the tractor; (3) Deere should have warned owners, operators, and dealers of front-end loaders that loaders should be used only with tractors that have falling-object protection and rollover protection; (4) once Deere learned of the hazards of large-round-bale roll-down

accidents, the company should have provided post-sale warnings to owners, operators, and dealers of the loaders, advising that a falling object protection system (FOPS) should be installed; and (5) Deere should have warned of the "need for self-leveling on the [front-end loader.]" Aplt. Br. at 26.

### 1. **The self-raising claim**

Plaintiff alleges that the front-end loader elevated itself "without conscious operator input." Aplt. Reply Br. at 2. He contends that because he was unaware of the self-raising hazard, he did not know that he was exposing himself to the risk of a roll-down accident. He maintains that Deere should have issued post-sale warnings about the risk of self-raising.

In its brief on appeal, Deere presents three arguments in support of the district court's grant of summary judgment on Plaintiff's warning-defect claim. Deere contends that (1) such a warning was unnecessary in light of Plaintiff's understanding of the overall danger of roll-down accidents; (2) Plaintiff has failed to establish that the alleged self-raising hazard was present at the time of sale; and (3) Plaintiff has not shown that it would have been feasible for Deere to issue him a post-sale warning about the self-raising hazard.

With respect to the necessity of a warning, Deere argues that the key question is whether Plaintiff appreciated the general danger of unrestrained objects falling from the front-end loader—not whether Plaintiff had detailed

knowledge of particular factors (such as the self-raising danger) that might contribute to a roll-down accident. In Deere's view, "Describing the theory of failing to warn [Plaintiff] in Plaintiff's highly selective manner is not relevant because [Plaintiff] was aware of the <u>ultimate</u> hazard, and aware of the serious consequences to the operator if that hazard came to pass." Aple. Br. at 17.

Plaintiff responds that the precise scope of his knowledge of the roll-down risk is essential information for determining whether the front-end loader was more dangerous than he perceived. He asserts that there was a critical gap in his understanding of the roll-down hazard: He did not realize that an accident could occur even if he was attempting to carry the large round bales at a low level, because he did not know that the front-end loader might unexpectedly rise to a high level.

In support of his position, Plaintiff points out that this circuit has recognized that an assessment of a product's dangerousness may take into account people's misconceptions about the possibility of using the product safely. In *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1104 (10th Cir. 1991), a case involving Kansas products-liability law, the court stated:

> [w]hether a danger is open and obvious depends not just on what people can see with their eyes but also on what they know and believe about what they see. In particular, if people generally believe that there is a danger associated with the use of a product, but that there is a safe way to use it, any danger there may be in

-10-

using the product in the way generally believed to be safe is not open and obvious.

(internal quotation marks omitted).

Deere disputes whether the proposition expressed in *Wheeler* is applicable in this case. In *Wheeler*, Deere notes, the manufacturer's primary defense against the plaintiff's warning-defect claim was that the danger posed by the product was open and obvious. Here, in contrast, Deere contends not just that the roll-down hazard was open and obvious, but that Plaintiff possessed actual knowledge of the hazard. Deere fails to explain the significance of this distinction, however. The essential point of *Wheeler* is that there may be a duty to warn if users incorrectly believe that a recognized danger can be avoided by a particular safety measure. Deere does not challenge Plaintiff's assertion that he thought he was avoiding the roll-down hazard by keeping the bale low, because he did not know that the front-end loader might elevate on its own. The logic of *Wheeler* extends to the circumstances of this case. On this record, Plaintiff's knowledge of roll-down dangers does not preclude his self-raising warning-defect claim.

Deere's second argument in support of the district court's grant of summary judgment on Plaintiff's claim concerning the self-raising hazard is that Plaintiff has no evidence that the alleged defect existed at the time of manufacture. As mentioned above, the Kansas Supreme Court has stated that there may be a post-

sale duty to warn consumers of defects "which originated at the time the product was manufactured and [were] unforeseeable at the point of sale." *Patton*, 861 P.2d at 1313.

We need not consider this issue, however, because Deere did not raise it below. In its summary judgment brief, Deere's discussion under the heading "Deere is entitled to summary judgment because it did not violate a post-sale duty to warn," App., Vol. I, at 90-95, nowhere specifically mentions Plaintiff's claims regarding the self-raising hazard. Although the brief does mention the self-raising issue in its discussion of whether Plaintiff's claim was barred because the "useful safe lives" of the tractor and front-end loader had expired by the time of Plaintiff's accident (an argument not pressed on appeal), "[w]e have consistently rejected the argument that raising a related theory below is sufficient to preserve an issue for appeal." *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1314 n.4 (10th Cir. 1998). Deere's discussion of the self-raising hazard in its argument concerning the useful life of the equipment did not put Plaintiff on notice that Deere was also arguing that the self-raising hazard did not exist at the time of sale. It would therefore be inappropriate to affirm Deere's summary judgment on that ground.

Deere next appears to argue that Plaintiff's post-sale warning-defect claim must fail because of the impracticability of providing such warnings. In *Patton*

the Kansas Supreme Court "recognize[d] a manufacturer's duty to warn ultimate consumers . . . who can be readily identified or traced . . . ." 861 P.2d at 1313. Deere points out that in this case Plaintiff purchased his tractor and loader second-hand. According to Deere, "There is no evidence Deere even knew [Plaintiff] had a 48 loader." Aple. Br. at 24. Even assuming that the local Deere dealership had a business relationship with Plaintiff, Deere maintains, Plaintiff's "casual purchases of parts from a merchant selling John Deere parts does not lead to an inference he owned a 48 loader . . . and certainly creates no duty to keep track of every implement he owned." *Id.*

Plaintiff disputes Deere's assessment of the feasibility of notifying him about potential hazards associated with the equipment. He alleges that an incident in the 1980s demonstrates that Deere could have determined that he owned a 4020 tractor and Model 48 loader. Deere had ordered that tractors be retrofitted with an anti-jumpstart kit. "[W]ithout being asked or making a charge to [Plaintiff]," a repairman from a local Deere dealership went to Plaintiff's farm and installed the kit on the loader. Aplt. Reply Br. at 11; App., Vol. II, at 431-32.

In our view, this evidence creates a question of fact as to whether it would have been practicable for Deere to identify Plaintiff as a product owner. Further, we note that Plaintiff asserted that Deere had wrongfully failed to issue a post-sale warning "to Deere loader owners, operators, and *dealers*" about the self-

raising hazard.  App., Vol. I, at 30.  The Kansas Supreme Court has suggested

that even when it may be infeasible for a manufacturer to issue post-sale warnings

to consumers, there may still be a duty to issue warnings to retailers.  In *Patton*

the court stated: "The facts may indicate that notice to all ultimate consumers who

purchased the product prior to the time the manufacturer learned of a potential

danger is unreasonable, if not impossible.  Notice to the distributor or retail seller

may, in certain contexts, meet the reasonableness standard."  861 P.2d at 1315.

Hence, even if it were clear that Deere could not identify Plaintiff as an owner of

the tractor and loader, Plaintiff may be able to prove a claim based on Deere's

alleged failure to advise *dealers* of the self-raising problem.

Accordingly, summary judgment was inappropriate on Plaintiff's self-

raising warning-defect claim.

### 2.  Other warning-defect claims

We discuss together Plaintiff's remaining warning-defect claims.  Three

claims relate to the absence of safety structures which, according to Plaintiff,

would prevent unrestrained objects from falling off loaders onto tractor operators.

Deere has identified a fundamental shortcoming in these claims—Plaintiff

understood the dangers associated with using a front-end loader to transport

unrestrained objects.  Deere points out, for example, that Plaintiff conceded in his

deposition that he knew that if an unrestrained large round bale were lifted in the

air, it could roll backwards onto the operator. Further, Plaintiff was familiar with available safety features that guard against the risk of falling objects. These features include not only canopy structures over the tractor, but also equipment such as bale grapples and bale spears, which secure hay bales onto front-end loaders. Given that "[t]here is no duty to warn of dangers *actually known* to the user of a product," *Long*, 715 P.2d at 1029 (internal quotation marks omitted), Deere contends that it had no duty to warn Plaintiff of the need for protection against falling objects. We agree with Deere and affirm summary judgment in favor of Deere with respect to these three warning-defect claims.

The same fate befalls Plaintiff's claim that Deere failed to "warn of the need for self-leveling on the front end loader." App., Vol. I, at 30. Plaintiff understood that the loader bucket should be kept level as the loader is raised, in order to prevent the load from becoming unstable and falling. The loader was no more dangerous in this respect than Plaintiff thought it was, so there was no duty to warn him. Kansas law does not require a manufacturer to advise of the availability of a new safety feature when the danger alleviated by the feature is apparent. Plaintiff asserts that he did not see the need for self-leveling, because he did not know that the loader might elevate itself. But this assertion supports only his self-raising warning-defect claim. There was no need for an additional warning regarding self-leveling. *See Long*, 715 P.2d at 1029.

**B.     Design-Defect Claims**

Plaintiff asserts two design-defect claims.  He alleges that the tractor and loader were defective because Deere (1) "fail[ed] to install on the tractor a ROPS [rollover-protection system] when it was manufactured" and (2) "fail[ed] to include self-leveling on the [front-end loader]."  Aplt. Br. at 36.

In *Lester v. Magic Chef*, 641 P.2d 353, 361 (Kan. 1982), the Kansas Supreme Court declared that design-defect claims should be assessed using the consumer expectations test described in Comment i to the Restatement (Second) of Torts § 402A (Restatement Second) (1965).  Comment i "defines an unreasonably dangerous product as one which is 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.'" *Delaney*, 999 P.2d at 944 (quoting the comment).  The Kansas courts have "continually reaffirmed that the consumer expectations test is the test in Kansas with regard to design defects." *Id.*  Thus, Deere might have sought to affirm summary judgment on the design-defect claims on a ground quite similar to the ground that largely prevailed with respect to the warning-defect claims—that is, that the equipment was no more dangerous than an ordinary consumer would consider it to be.

Deere's sole argument on appeal, however, is that Plaintiff's design-defect claims are barred because the equipment had undergone a substantial modification. Deere argues that Plaintiff "fundamentally altered the character of the product" when he welded bale-fork attachments onto the bucket of the front-end loader. Aple. Br. at 51. This alteration enabled Plaintiff to carry large round bales. Deere terms it "obvious" that Plaintiff's "accident could not have happened" absent his capacity to "lift large round bales with the loader." Aple. Br. at 31.

Deere maintains that "[a] showing that the tractor/loader had undergone a substantial change precludes recovery for design claims under Kansas law." Aple. Br. at 32. It points out that the Kansas pattern jury instruction for products-liability claims states that an element of the cause of action is that "[t]he product was expected to reach and did reach the hands of the plaintiff without substantial change in the condition in which it was (manufactured) (sold)." Pattern Instructions Kansas Civil 3d § 128.18. (This pattern instruction follows Restatement Second § 402A(1)(b), which states as a requirement for a strict-products-liability claim that the product "is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.") Deere also cites opinions from other jurisdictions which adhere to the view that a lack of substantial change is an essential element of the plaintiff's case. *See, e.g., Glass*

*v. Allis-Chalmers Corp.*, 789 F.2d 612, 613 (8th Cir. 1986) (because Missouri follows § 402A, plaintiff "needed to prove . . . that the product was expected to and did reach the user or consumer without substantial change in the condition in which it was sold").

The question that remains, however, is whether a particular change is "substantial." The opinions of the Kansas appellate courts provide no guidance on this issue. Comment p to Restatement Second § 402A largely left the matter to further development. It said:

> *p. Further processing or substantial change.* Thus far the decisions applying the rule stated have not gone beyond products which are sold in the condition, or in substantially the same condition, in which they are expected to reach the hands of the ultimate user or consumer. In the absence of decisions providing a clue to the rules which are likely to develop, the [American Law] Institute has refrained from taking any position as to the possible liability of the seller where the product is expected to, and does, undergo further processing or other substantial change after it leaves his hands and before it reaches those of the ultimate user or consumer.
>
> It seems reasonably clear that the mere fact that the product is to undergo processing, or other substantial change, will not in all cases relieve the seller of liability under the rule stated in this Section. If, for example, raw coffee beans are sold to a buyer who roasts and packs them for sale to the ultimate consumer, it cannot be supposed that the seller will be relieved of all liability when the raw beans are contaminated with arsenic, or some other poison. Likewise the seller of an automobile with a defective steering gear which breaks and injures the driver, can scarcely expect to be relieved of the responsibility by reason of the fact that the car is sold to a dealer who is expected to "service" it, adjust the brakes, mount and inflate the tires, and the like, before it is ready for use. On the other hand,

the manufacturer of pig iron, which is capable of a wide variety of uses, is not so likely to be held to strict liability when it turns out to be unsuitable for the child's tricycle into which it is finally made by a remote buyer. The question is essentially one of whether the responsibility for discovery and prevention of the dangerous defect is shifted to the intermediate party who is to make the changes. No doubt there will be some situations, and some defects, as to which the responsibility will be shifted, and others in which it will not. The existing decisions as yet throw no light upon the questions, and the Institute therefore expresses neither approval nor disapproval of the seller's strict liability in such a case.

In our view, whether a change is "substantial" must depend on whether the product's design was defective prior to the change. In particular, a product is not defectively designed just because the danger of the product, as modified after sale, exceeds what consumers would expect. In that circumstance, the modification is substantial. But if before the modification the product's danger exceeded consumer expectations, then the product was defectively designed under Kansas law; whether that defect leads to liability depends upon whether the defect was a proximate cause of the injury at issue. *See* Restatement (Third) of Torts: Products Liability § 15 cmt. b (1998) (treating modification issue as a question of causation); William L. Prosser, Handbook of the Law of Torts § 102 (4th ed. 1971) (same).

On appeal Deere has not argued that the design defects alleged by Plaintiff were not defects. It has argued only that Plaintiff's modifications relieve it of

-19-

liability. As we analyze the matter, this argument amounts to an argument that the pre-modified design was not a proximate cause of the injury.

For the causation issue arising from modification of a product, we have circuit precedent interpreting Kansas law, *Burnette v. Dow Chemical Co.*, 849 F.2d 1269 (10th Cir. 1988). The test we applied in that case was reasonable foreseeability. *Burnette* concerned a products-liability claim involving a chemical storage tank that exploded. The company using the tank had converted it from an atmospheric tank, designed to hold chemicals under certain levels of pressure, to a pressure tank, designed to hold chemicals at a higher pressure. *Id.* at 1271. Having observed that the accident appeared to be attributable to the changes made to the tank, *Burnette* stated that the manufacturer could be held liable for a design defect only if it "should have foreseen the possibility that this tank would be modified in this way." *Id.* at 1274. The court concluded that "there was essentially no evidence to show that [the manufacturer] should have foreseen the conversion of its atmospheric tank into a pressure tank equipped with a malfunctioning pressure valve or that the tank would be subject to extreme internal pressure." *Id.* at 1275. *Burnette* held that the plaintiffs had therefore failed to establish a design-defect claim.

Here, Deere contends that it "could not reasonably have foreseen the modifications made by [Plaintiff] to add large round bale forks . . . [to] the bucket

of the loader when large round bales were either not invented or not widely known." Aple. Br. at 45. The tractor was sold in 1964 and the loader was sold in 1972. Large round bales did not begin to be used until late 1972 or early 1973.

Plaintiff responds by calling Deere's foreseeability analysis "myopic," Aplt. Reply Br. at 18, because Deere focuses only on whether the particular object that fell onto Plaintiff was in use at the time the front-end loader was sold. He asserts that in promoting its tractors and loaders, Deere has emphasized the versatility of the equipment and the variety of items that can be carried. He points to a 1957 brochure for a front-end loader that said:

> Though the principal purpose of the manure loader is to handle manure, it can oftentimes be used for a variety of other jobs. It saves the farmer the hard work of lifting on many other jobs . . . moving hog houses, fencing, feed bunks, sacked feed, bales, rocks, logs, and any other materials which do not overload the tractor or loader. Furthermore, the loader is quickly adapted for other jobs as well, simply by replacing or adapting the bucket.

App., Vol. II, at 463-64. Plaintiff takes the position that Deere could reasonably foresee that users would put front-end loaders to a broad range of uses and that farmers might adapt the equipment to facilitate carrying different types of materials.

On the record before us, we believe that foreseeability is a fact issue for the jury. Although Deere could not have anticipated large round bales, it may have

reasonably been able to foresee analogous uses of the equipment. Accordingly, we reverse summary judgment on Plaintiff's design-defect claims.

### C. Punitive Damages

Plaintiff has failed to point to any evidence that Deere's conduct merited punitive damages. We therefore affirm the district court's dismissal with prejudice of the punitive-damages claim.

## III. Conclusion

We REVERSE the district court's summary judgment on Plaintiff's warning-defect claim regarding the self-raising hazard, and we REVERSE summary judgment on Plaintiff's design-defect claims. We AFFIRM the district court's summary judgment on all Plaintiff's warning-defect claims other than the self-raising claim, and we AFFIRM the district court's dismissal of Plaintiff's punitive-damages claim. We REMAND this case to the district court for further proceedings concerning the claims on which we have reversed judgment.